## FARMERS & MECHANICS SAVINGS BANK OF MINNEAPOLIS v. DEPARTMENT OF COMMERCE, SECURITIES DIVISION.

102 N. W. (2d) 827.

May 6, 1960—No. 37,908.

*Best, Flanagan, Lewis, Simonet & Bellows* and *George H. Gould,* for relator.

*Miles Lord,* Attorney General, *Harold J. Soderberg,* Assistant Attorney General, and *Jack L. Chestnut,* Special Assistant Attorney General, for respondent.

*Diessner, McEachron, Wurst, Bundlie & Carroll,* for The Independent Bankers Association, amicus curiae.

MURPHY, JUSTICE.

This case is before us on a writ of certiorari to review a decision of the Department of Commerce, Securities Division, State of Minnesota. The relator bank applied to the Department of Commerce for authority to establish a branch office in the city of Minneapolis and the application was denied. We are asked to determine if the Department of Commerce was correct in holding that a mutual savings bank organized under L. 1879, c. 109, is without authority to establish a branch office in the city in which it is chartered to act.

The relator, Farmers and Mechanics Savings Bank of Minneapolis,

has been successfully operated for many years. It was first organized in 1874 under L. 1867, c. 23, and later reorganized under L. 1879, c. 109, by a group of public-spirited citizens and disinterested trustees for the purpose of receiving on deposit the savings of "mariners, tradesmen, clerks, mechanics, laborers, miners, servants," and other small depositors and of investing such savings for the sole benefit of such depositors. Its place of business has been located in the lower loop area of Minneapolis since 1874. The trustees of the bank feel that because of the congested traffic conditions surrounding its location, and the movement of people away from the loop area toward the south and southwest sections of the city, it is necessary for them to establish a branch in that area so as to conveniently serve those of its customers who live there and others who are said to be now denied savings bank facilities. The argument of the bank emphasizes that it was established to serve people of modest means who are small but steady savers and who build up their accounts by regular and frequent deposits. Convenience and availability of service are essential to this segment of the population. It argues that the expense of parking in the loop area, and the expense and inconvenience of public transportation, all serve to discourage habits of thrift by the very class of people this institution is required to serve.

It is the respondent's contention that under the charter provisions a mutual savings bank is without express authority to establish a branch bank and that lacking that authority none can be implied.[1]

---

[1]The following are pertinent provisions of L. 1879, c. 109:

Section 1. "All savings banks or institutions for savings now existing, or which may hereafter be organized under and by virtue of any law of this State, are hereby declared to be corporations possessed of the powers and functions of corporations generally, and as such shall have power:

\* \* \* \* \*

"7. To receive money on deposit, to invest the same, and further transact the business of a savings bank, as hereinafter provided.

"8. To exercise any corporate powers necessary to the exercise of the powers above enumerated and given."

Section 17. "The board of trustees of any such corporation shall have power from time to time to make such by-laws, rules and regulations as

The relator bank recognizes that under the provisions of M. S. A. 48.34 branch banks are prohibited.[2] It argues that under the definitions of "bank," "savings bank," and "trust company" (§ 47.01), the prohibition contained in § 48.34 does not apply to it because it is not engaged in business as a commercial bank or trust company. It must be conceded that the relationship between a depositor in a bank or trust company differs from that of a depositor in a savings bank. In the commercial bank or modern-style savings bank the depositor is a creditor of the institution. In State ex rel. Douglas v. Savings Bank, 87 Minn. 473, 92 N. W. 403, it was noted that the relation of a savings bank to a depositor is substantially that of trustee and cestui que trust instead of debtor and creditor. It is unnecessary for us to discuss the statutes as they bear upon the corporate character of the relator bank since we conclude that the issue boils down to a question of whether the act under which the relator is organized gives it the power to maintain a branch office.

It is well recognized that in the absence of express statutory authorization a bank has no right to establish branch banks. 9 C. J. S., Banks and Banking, § 55; 7 Am. Jur., Banks, § 23; Annotations, 50 A. L. R. 1340 and 136 A. L. R. 471. Unlike other commercial or manufacturing corporations, banks are quasi-public in nature and the

---

they may think proper for the election of officers, for prescribing their respective powers and duties, and the manner of discharging the same; for the appointment and duties of committees, and generally for transacting, managing and directing the affairs of the corporation. *Provided,* Such by-laws, rules and regulations are not repugnant to nor inconsistent with the provisions of this act, to the constitution and laws of this State or of the United States, and a copy of the same shall be transmitted to the Public Examiner, who shall also be notified of any amendment or change therein."

[2] M. S. A. 48.34 provides: "No bank or trust company organized under the laws of this state shall maintain a branch bank or receive deposits or pay checks within this state, except at its own banking house, and the commissioner shall take possession of and liquidate the business and affairs of any state bank or trust company violating the provisions of this section, in the manner prescribed by law for the liquidation of insolvent state banks and trust companies."

legislatures have in the public interest exercised a careful supervision over them. It appears from the decisions and administrative interpretations that the policy of the law is that banks are not allowed to exercise functions not strictly authorized by law. Bruner v. Citizens' Bank, 134 Ky. 283, 120 S. W. 345.

While the relator bank concedes that there are no authorities supporting the proposition that a savings bank has authority to establish branch offices, it advances the ingenious theory that the implied power to do so is inherent in the trust character of its management. It contends that it is not only its purpose but its public duty to provide facilities for receiving the savings of small depositors, arguing "It is a positive duty which the trustees must, in their fiduciary capacity, discharge to the best of their ability." It reasons therefore that implicit in this duty is the power to establish a branch office so as to better serve the small depositor who finds it inconvenient to do business at the banking house.

While there may be merit in the bank's purpose—to reach by a branch office that segment of the population which it was incorporated to serve—we feel that the relief it seeks is not within the province of the commissioner nor this court to grant.[3] We find nowhere in the law creating the bank the requested authority either expressed or necessarily implied, nor can we find an implied power which derives from the trust character of the management. The duty and trust imposed upon the trustees relates to the integrity of their management and does not necessarily include the requirement that its places of business be multiplied.

---

[3]The powers of the commissioner generally with relation to banks are largely involved with the constant supervision and examination of the affairs of the bank through examiners. With reference to savings banks the commissioner has the initial responsibility of determining the expediency of the organization and, before the issuance of a certificate of incorporation, is required to ascertain the need for the service in a particular area, whether there is a reasonable prospect of successful operation in the vicinity of the proposed location, and the character and fitness of the persons named as trustees in the certificate.

There is little to be gained in an examination of the applicable statutory provisions in an attempt to determine the intent the legislature had in 1879 with reference to the subject of branch bank offices. Statutes are to be read in the light of attendant conditions at the time of their enactment. It cannot be assumed that when this law was enacted the legislature could foresee the changes in urban life which followed. The fact that such changes have occurred does not permit the court to engraft upon the law an amendment which may substantially expand the chartered rights of the relator. 50 Am. Jur., Statutes, § 237; 17 Dunnell, Dig. (3 ed.) § 8947a. This view is supported by recognized legislative policy and the respect courts must accord to practical construction placed on a statute by executive or administrative officers. In ascertaining legislative intent administrative interpretation of a statute may be considered and where, as here, it is of long standing, it is entitled to great respect and should not be disturbed except for very cogent reasons. 17 Dunnell, Dig. (3 ed.) § 8952.[4]

It is our view that if the establishment of branch offices is necessary and desirable to the corporate life of savings banks it is for the legislature to grant that relief and not for the court.

The relator further points to a series of Federal cases dealing with Federal savings and loan associations in which it is held that such associations are permitted to have branch offices with approval of the Federal Home Loan Bank Board and that savings and loan branches have been permitted notwithstanding the fact that the Home Owners' Loan Act of 1933 is silent on that subject.[5] We think that that line of

---

[4]Opinions Attorney General, No. 29a-3, March 15, 1916; No. 29a-3, December 19, 1919; No. 29a-3, January 5, 1959; Report Attorney General, 1922, No. 11.

[5]North Arlington Nat. Bank v. Kearny Fed. Sav. & Loan Assn. (3 Cir.) 187 F. (2d) 564, certiorari denied, 342 U. S. 816, 72 S. Ct. 30, 96 L. ed. 617; Springfield Institution for Sav. v. Worcester Fed. Sav. & Loan Assn. 329 Mass. 184, 107 N. E. (2d) 315, certiorari denied, 344 U. S. 884, 73 S. Ct. 184, 97 L. ed. 684; First Nat. Bank v. First Fed. Sav. & Loan Assn. 96 App. D. C. 194, 225 F. (2d) 33; United States ex rel. Wisconsin v. First Fed. Sav. & Loan Assn. (E. D. Wis.) 151 F. Supp. 690.

authority is clearly distinguishable. The Federal Home Loan Bank Board has been empowered to make rules and regulations governing operation of Federal savings and loan associations which have the force and effect of law.[6] We find no such delegation of power under our statute which permits the commissioner to adopt regulations under which a branch office for a savings bank may be authorized.

Affirmed.

MR. JUSTICE THOMAS GALLAGHER took no part in the consideration or decision of this case.

MR. JUSTICE LOEVINGER, not having been a member of the court at the time of the argument and submission, took no part in the consideration or decision of this case.

---

[6]Home Loan Bank Board v. Mallonee (9 Cir.) 196 F. (2d) 336, certiorari denied, 345 U. S. 952, 73 S. Ct. 863, 97 L. ed. 1374; Community Fed. Sav. & Loan Assn. v. Fields (8 Cir.) 128 F. (2d) 705; People v. Coast Fed. Sav. & Loan Assn. (S. D. Cal.) 98 F. Supp. 311; Springfield Institution for Sav. v. Worcester Fed. Sav. & Loan Assn. *supra*; Woodard v. Broadway Fed. Sav. & Loan Assn. 111 Cal. App. (2d) 218, 244 P. (2d) 467; 12 USCA, § 1464.